# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| FRANCES UDUJIH, <br>              Plaintiff, <br><br>    v. <br><br> CITY OF PHILADELPHIA, HELGA KRAUSS, EUGENE MCCAULEY, and KATHY SYKES, <br>            Defendants. | Civil Action No. 06-2629 |

**OPINION**

September 24, 2009                                                                                      Pollak, J.

     Plaintiff Frances Udujih brought suit against the City of Philadelphia and three individuals from the city's Department of Mental Retardation Services, in their individual and official capacities, on claims of national origin discrimination and for injuries related to this alleged discrimination.  Several of the claims contained in the complaint have previously been dismissed (docket no. 24).  Plaintiff's remaining claims are for 1) violation of 42 U.S.C. § 1981 (Title VII of the Civil Rights Act of 1964), 2) violation of the Pennsylvania Human Relations Act, 3) common law defamation, and 4) common law intentional infliction of emotional distress.  All the defendants now move this court for summary judgment (docket no. 63), and the plaintiff has responded (docket no. 69).

**I.**

1.

I will recount the background of this suit in some detail because determination of discrimination claims demands close attention to the factual record. *Cf. Greer v. Bd. of Ed. of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

A.  Factual Background

Plaintiff Francis Udujih was born in Nigeria and became a permanent resident of the United States in 1988, eventually obtaining citizenship. Pl. Dep. at 7-8. As a Nigerian, English is her first language. *Id*. at 13. It is noted throughout the record that Udujih speaks English clearly and with a discernible Nigerian accent. *See, e.g.,* Exh. 4 (Pl. Decl.) ¶ ¶ 9-10.

Educated in English literature, Udujih began working formally with individuals with developmental disabilities in the early 1990s. *See* Pl. Exh. 3 (Udujih resume). From 1993 through 1998, Udujih served as a program specialist for two different nonprofit organizations, providing support to persons with developmental disabilities in Philadelphia. *Id*.

In June 1998, Udujih became an employee of the City of Philadelphia. *Id*. She began as a Social Worker II in the Department of Human Services, working on child abuse and neglect cases. *Id*. In October 2000, Udujih transferred to the Department of Public Health ("DPH") where she remained in the position of Social Worker II, once again serving persons with developmental disabilities. Pl. Exh. 1.

Starting in 2001, Udujih undertook to obtain a promotion to the position of Public Health Program Analyst ("program analyst"), an effort that became the subject of this

2.

lawsuit.  In general terms, program analysts in the Department of Public Health manage relationships with third-party nonprofit organizations that contract with the City of Philadelphia to provide services to residents with special needs.  Pl. Exh. 14.

The hiring of individuals for the program analyst positions is subject to Philadelphia's civil service regulations. *See* Pl. Exh. 3 (Sykes Dep.) at 7-8; 53 PA. STAT. §§ 13101-16; Phila. Civ. Serv. Reg. Chs. 7-11.  The hiring at issue in this suit was "open competitive," which meant that both current city employees and outside candidates would be considered.  Pl. Exh. 14; Phila. Civ. Serv. Reg. § 9.025.  In general, open competitive hiring begins with an examination process, overseen by the Office of Human Resources ("HR"), that must be "competitive, uniform, and . . . designed to measure fairly the relative qualifications of competitors."  Phila. Civ. Serv. Reg. § 9.012.  Examination must include review of "competitor's qualifications, record of performance, seniority and conduct" (*Id*. § 9.022) as well as written tests or other formal evaluation instruments as necessary (*Id*. § 9.04).  Competitors then receive a composite score that reflects all elements of their examination review.  *Id*. § 9.06.  Once the examination period concludes, HR creates a list of qualified, eligible candidates ranked according to their composite examination score.  *Id*. §§ 9.067, 9.07, 10.01.  HR provides a portion of that list to the department seeking to fill a position by starting at the top of the ranked list and providing only enough names to ensure that two individuals can be considered for each open position.  *Id*. at 11.04.  For reasons explained below, that requirement results in two interview candidates for one job; three for two; five for three jobs; and so forth.

3.

The department seeking to make a hire must interview and select between the top two eligible candidates on the ranked HR list for each open position. *Id*. § 11.03. Each individual is interviewed once, but has the opportunity for consideration twice, so long as positions remain. *Id*. § 11.091. For example, if A, B, and C are the top-ranked candidates for two openings, A and B will be interviewed and considered for the first job. The unselected one is then considered for the second job (without an additional interview) against C who will then be interviewed. *See, e.g.,* Krauss Dep. at 44-45. If a candidate is not selected after consideration for two openings, that individual is removed from the original list of eligible candidates and must re-apply and re-test for the next round of job openings. Phila. Civ. Serv. Reg. § 11.05.

In 2001, when Udujih first applied for the position of program analyst, there were two openings. Pl. Exh. 18 (EEOC Opin.); Pl. Dep. at 17. Udujih took the required written test; her application was ranked third. EEOC Opin.; Pl. Dep. at 17. DPH hired the first- and second-ranked candidates without interviewing Udujih. Pl. Dep. at 17, 22.

In 2004, HR announced program analyst openings again, and Udujih applied again and took the required test. Pl. Dep. at 17. HR conducted the examination process, including the testing, and generated a list of twelve ranked candidates. Pl. Exh. 15; Def. Exh. 7. Udujih was ranked third on the list.

DPH first asked for interview candidates for three program analyst positions,[1] and HR provided the top-five ranked persons on the eligible list: Crystal Garvin, Aswad Hopewell, Frances Udujih, Robin Mack, and Vera Stevens.  Pl. Exh. 15; Def. Exh. 8. Kathy Sykes, Director of Mental Retardation Services, asked Helga Krauss and Eugene McCauley, who were managers of the units that were hiring program analysts, to participate in the interviews for the three positions.  Sykes Dep. at 9-10.  Garvin and Hopewell were interviewed for the first open position, and Garvin was selected. McCauley Dep. at 34.  Udujih was interviewed for the second open position, and Hopewell was considered for the same slot.  McCauley Dep. at 48-49.  Hopewell was selected.  Sykes Dep. at 22.  Mack was interviewed for the third open position, and Udujih was considered for the same slot.  Krauss Dep. at 37.  Mack was selected.  Sykes Dep. at 22.  Robin Mack was the only 'outside' candidate considered for the three positions.  Pl. Exh. 9 (Mack Resume); Pl. Dep. at 22-23.

Udujih was interviewed by four people:  McCauley, Krauss, and two other supervisory-level DPH employees — Denise Patterson and Theresa Thompson.  Pl. Decl. ¶ 1.  Questions included inquiries into Udujih's professional background and experience as well as "hypothetical job situations."  Pl. Decl. ¶ 7.  While DPH did not use a standard rubric or list of questions, managers stated that the interviews tended to follow a familiar

---

[1]  The record shows that the same twelve-person eligible list was used to fill two more positions in 2005.  *See* Pl. Dep. at 44-45; Pl. Exh. 15, 16.  This apparently was in keeping with Phila. Civ. Serv. Reg. § 10.071 (Non-Continuous and Periodic Lists).  *See also* note 2 *infra*.

pattern.  *See* McCauley Dep. at 24.  Krauss found that Hopewell, Udujih, and Mack were relatively equivalent in experience and background.  Krauss Dep. at 32, 45.  Compared to the other two, however, Krauss found Udujih "more restricted" during her interview and not particularly detailed or forthcoming in her answers.  *Id*. at 39-40.  McCauley's report of the interviews was similar; he further stated that Udujih acted "like she was being attacked almost . . . as if we were dueling or something."  McCauley Dep. at 49-50. Patterson and Thompson found that Udujih was brief but performed well in the interview. Pl. Exh. 23 at 3; Pl. Exh. 24 at 3.

Udujih believed that "[w]hen you took the test, and you passed, they will send the list of those and you are promoted according to your score on the list."  Pl. Dep. at 20. She further believed that the interview was "just a formality for you to chose [sic] which unit you want to go to."  *Id*. at 140.  Udujih contends that she "was very careful and diligent in listening and answering" interview questions, and that McCauley and Krauss were not "receptive or reactive to what I was saying."  Pl. Decl. ¶¶ 8, 13.  She further stated that "maybe [they] didn't ask me questions that required me to sell myself."  Pl. Dep. at 82.

A DPH staffer informed Udujih that she had not been promoted.  Pl. Dep. at 18-19. Having been passed over for two positions, Udujih was removed from the original eligibility list pursuant to hiring regulations.[2]  Pl. Dep. at 43-44; Phila. Civ. Serv. Reg. §

---

[2]  In 2005, DPH interviewed three other candidates from the original eligibility list and made two more hires.  Pl. Dep. at 44-45; Pl. Exhs. 15, 16.  In that instance, the fifth-ranked candidate on the eligibility list, Vera Stevens, 'lost out' to the sixth-ranked

11.05.  Udujih complained to her union representatives about the hiring outcome, and then filed a complaint for national origin discrimination with the Equal Employment Opportunity Commission ("EEOC") in March 2005.  Pl. Dep. 19-21; Pl. Exh. 18.  Then, as now, her claim was that she was not hired due to her accent and the fact that she was born in west Africa.  *See, e.g.,* Pl. Dep. at 20.  Udujih has stated that, apart from the hiring decisions in 2004, she neither experienced nor witnessed any other incidents or events that suggested national origin discrimination by DPH or its staff.  Pl. Dep. at 94-95, 111-12.  She has related, however, that she spoke with a program analyst who was born in Sierra Leone and who suggested that he experienced discrimination before finally being promoted.  Pl. Dep. at 117.

The EEOC conducted a hearing on the complaint, and on January 20, 2006 issued a determination that "concluded that [Udujih] was discriminated against because of her national origin in being denied two positions in favor of less qualified American born candidates."  EEOC Opin.  The EEOC ordered "conciliation" of the matter, and the parties were directed to enter confidential negotiations.  EEOC Opin.; Pl. Dep. 62, 65.  DPH decided that it would promote Udujih right away.  Pl. Exh. 17 (DPH internal memorandum).  Shortly thereafter, however, Udujih received a telephone call from a staffer at the EEOC informing her that the City of Philadelphia decided to decline

---

candidate, Merrel Anderson for the first of these two positions.  Stevens was then selected for the second of these two positions over the seventh-ranked candidate, Renee McLane.  *Id*.

conciliation because a DPH employee reported that Udujih was discussing the EEOC

decision with fellow employees and "telling people to sue the City."  Pl. Dep. at 62-65.

Udujih denied then, and denies now, that she ever violated the confidentiality agreement.

*Id*.

B.      Procedural History of Udujih's Civil Lawsuit

        In June 2006, Udujih filed a civil rights action against the City of Philadelphia.  In

October 2006, Udujih amended her complaint to join Sykes, McCauley, and Krauss in

their individual and official capacities.[3]  Udujih brought claims under 42 U.S.C. §§ 1981,

1983, 1985, 1986, and 2000e-2 (Title VII of the Civil Rights Act of 1964) as well as the

Pennsylvania Human Relations Act ("PHRA").  She also brought common law claims for

breach of contract, promissory estoppel, slander, libel, and infliction of emotional

distress.

        The defendants filed a motion to dismiss, which this court granted in part and

denied in part.  *See* Opinion & Order of May 10, 2007 (docket no. 24).  Plaintiff's claims

were all subjected to the established statutes of limitations, which for almost all the

surviving claims cut off liability for events that took place, variously, prior to May, June

or October 2004 (the § 1981 claim was limited to events starting in June 2002).  *Id*.  The

court also dismissed a number of plaintiff's causes of action.  *Id*.  What remained for

adjudication were the following:  claims under Title VII, § 1981, and the PHRA for

---

        [3] Udujih also joined Larry Pace, Director of Operations for the DPH's Mental
Retardation Services.  The parties later stipulated to the dismissal of Pace from the suit.

national origin discrimination against all defendants; a claim under § 1983 for denial of

equal protection against all defendants; a claim for slander and libel against defendant

Sykes; and a claim for infliction of emotional distress against the defendants Sykes,

McCauley, and Krauss.  *Id.*

## II.

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *IFC Interconsult, AG v. Safeguard*

*Int'l Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006).  Facts are material if they "bear

on an essential element of the plaintiff's claim."  *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337

(3d Cir. 2002) (quoting *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999)).  Further,

there is a genuine issue of material fact if "a reasonable jury could find in favor of the

nonmoving party."  *Id.*

A party seeking summary judgment carries the initial burden of informing the

court of the basis for its motion and identifying the portions of the record that show that

there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  In this instance, the non-moving party would bear the burden of proof at trial.

Consequently, the moving party must show that the non-moving party cannot support her

case with the evidence in the record.  *Celotex*, 477 U.S. at 325.  To rebut, the non-moving

party must identify facts that create a genuine issue of dispute for trial.  Fed. R. Civ. P.

56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    Claims of Discrimination Brought Under Title VII, 42 U.S.C. § 1981, and PHRA

Employment claims under Title VII, § 1981, and the PHRA are all evaluated using the familiar *McDonnell Douglas* framework. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). The first step of the framework requires that the plaintiff come forward with evidence making out a prima facie case of illegal discrimination. *Id.* The burden then shifts to the employer to come forward with legitimate non-discriminatory reasons for its decision. *Id.* Following this, the burden shifts back to the plaintiff to show that the proffered reasons comprise only a pretext for discrimination. *Id.* "Our experience is that most cases turn on the third stage, *i.e.,* can the plaintiff establish pretext." *Jones*, 198 F.3d at 410.

For purposes of the instant motion, defendants assume that Udujih can establish a prima facie case that she was not promoted in 2004 for discriminatory reasons. Pl. Mem. at 14. Defendants offer, as their legitimate non-discriminatory reason for their decisions, that they "selected Mr. Hopewell and Ms. Mack for the position because [these

candidates] demonstrated superior abilities during the interview." *Id.*  Accordingly, the burden now shifts to the plaintiff to establish that this reason is mere pretext.

At this stage of analysis, "a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Jones*, 198 F.3d at 413 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  In order to prevail on the first of these options:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997).  In elucidating the second option to establish pretext, the Third Circuit has stated that:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [impermissible factors were] a motivating or determinative factor in the employment decision.  For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

*Simpson v. Kay Jewelers*, 142 F.3d 639, 644-45 (3d Cir. 1998).  Unless the plaintiff adduces evidence of previous discrimination against her or another individual, the use of specific comparators is the common method for establishing differential treatment.  *See id.*; *Frantz v. Ferguson Enters., Inc.*, Civ. No. 07-4083, 2009 WL 222419, at *5-6 (E.D. Pa. Jan. 28, 2009) (examining recent decisions).

       1.    *Credibility of defendants' proffered reason*

       Defendants aver that (i) competing candidates for the two analyst positions were considered by the decision-makers to be roughly equivalent prior to interviews; and (ii) Udujih did not distinguish herself above Hopewell and Mack during the interview phase. Defs. Mem. at 7 (*see* ¶7), 14.  To support their position, defendants point to deposition excerpts by McCauley and Krauss comparing Udujih with the other two candidates as well as statements by the plaintiff regarding her beliefs about the interview.  *Id*. 14-15.

       Plaintiff does not directly address this phase of the *McDonnell Douglass* review. Udujih's arguments suggest, however, that the defendants' nondiscriminatory reason should be disbelieved because (i) the interview process involved a level of discretion that permitted illegal discrimination; and (ii) Udujih was clearly more qualified than Mack. Pl. Resp. at 10, 14.[4]  In support of the first point, plaintiff contends that the individual defendants:  used similar but not identical questions; interviewed candidates at lengthy

---

    [4]  The plaintiff did not include page numbers in the copy of the memorandum provided to chambers and, at all events, the pagination differed from the copy filed electronically with the Clerk of Court (though the text did not).  Page numbers here will refer to the copy of the response filed electronically with the Clerk.

intervals; could not remember details about the interviews; and lost notes from the interviews.  *Id*. at 10-11.  Plaintiff also appears to suggest that McCauley and Krauss were too old and too busy to serve effectively as interviewers.  *Id*. at 11.  On the second point, plaintiff indicates that Mack was not a city employee, was below Udujih on the ranking list, and had a lower examination score.  *Id*. at 14.

None of plaintiff's arguments undermine defendants' rationale for their actions or in any way suggest discriminatory animus.  The civil service process undertaken by the city appears to accomplish three ends, as demonstrated in the record.  First, it ensures that only qualified candidates for a position have the opportunity to interview with the hiring department.  Second, it offers the hiring department a choice, for each position, between two candidates with closely similar credentials, experience, and aptitude.  Third, it rewards high-performing candidates by offering them the earliest opportunities to interview for one of the open positions.  Udujih's complaints that the interview stage involved subjective elements and was not entirely scripted demonstrates disagreement with the hiring policy and practices generally; neither plaintiff's arguments nor the record reveal implausibility in the defendants' explanation for the outcome here.  In addition, the fact that interviewer Teresa Thompson stated that Udujih "performed well enough" in the interview (Pl. Exh. 23 ¶ 4) does not suggest the kind of inconsistency that creates a triable issue of fact here, particularly given that Thompson also stated that "Robin Mack elaborated more on the questions" (*Id*. ¶ 5).  *See* Pl. Resp. at 13.

13.

Further, I cannot perceive that candidate Robin Mack was so patently less qualified than the plaintiff as to permit a factfinder to conclude that the defendants' explanation is disingenuous.  By all appearances, Mack was highly qualified for the position and performed admirably in her interview.  The hiring process here was 'open competitive' which meant that non-city candidates were welcome to apply and would be evaluated on their credentials and experience in the same manner as internal candidates. The fact that Udujih scored five points higher on the examination process than Mack would not appear to be strictly determinative of a hiring decision; Udujih's higher score afforded her an earlier opportunity for consideration for open positions but was not a guarantee to a promotion.  In another example, during a later hiring process from the same eligible list, a lower-ranked candidate, Merrel Anderson, prevailed over the person directly above her on the list, Vera Stevens.  Stevens had another chance for the next position, which she obtained.  Pl. Exh. 15, 16.  Nothing in the evidence, beyond the plaintiff's stated perception of how the process ought to unfold, demonstrates any weaknesses or implausibilities in defendants' proffered reason for passing over Udujih twice in the final phase of hiring.

2. *Evidence of discrimination or invidious motive*

Plaintiff asserts that McCauley and Krauss undertook to discriminate against Udujih on behalf of the city and for personal reasons.  Pl. Resp. at 12 ("[McCauley's] motive and intent was to discriminate against plaintiff, of Nigerian Origin [sic] and accent, in favor of Ms. Mack, an African American.  Ms. Kruass [sic] actively assisted

14.

and abetted him….").  In her response to the motion, Udujih does not offer any

comparators beyond Robin Mack (whose candidacy, as regards plaintiff's claims, was

examined *supra*), so the analysis here will focus on evidence of previous discrimination

against the plaintiff or other DPH employees.

There is no evidence of past discrimination in the record.  Udujih stated in her

deposition that she had experienced no discrimination by any of the defendants beyond

her inference that invidious motivations must have lain behind her failure to obtain a

promotion.  *See, e.g.,* Pl. Dep. at 111:

> Q:  I'm asking you . . . if you did have some experiences that would make
> you believe that there is a bias against people from Africa or people from
> your country or people with your accent, if there is an experience, such as
> that, I want to know what that experience – if you have had such an
> experience, other than the promotional situation, if you have had an
> experience like that, please tell me.  If not –
> A [plaintiff]:  I don't have any.
> Q:  -- please feel free to just tell me no.
> A:  No, I don't have any.

Regarding the interviewing and selection at issue here, Udujih makes the following

contention in her response memorandum:

> Defendants admit that plaintiff speaks with an accent. (*Exhibit 22,
> McCauley Deposition, p. 52).* When comparing plaintiff to Ms. Mack, Mr.
> McCauley also considered their ability to work with cognizant [sic]
> agencies. He said you don't have time to write a letter. This criterion is not
> an objective measurement. This is an indictment against plaintiff's verbal
> communications skills.

Pl. Resp. at 14.  I am unpersuaded that the record, including the McCauley deposition,

contains any suggestion of discriminatory motive or conduct by the defendants here.

Plaintiff's arguments, and her own statements in her deposition, consist of allegations

without a mote of supporting evidence.  *See, e.g.,* Pl. Dep. at 83 ("I don't know.  My thing

is I'm sure the decision was even made – once they saw my name on the list.  Udujih is

strange and not an American name.").

Though she does not argue it in her response, Udujih does discuss in her

deposition another West African immigrant whom she alleges experienced difficulty

obtaining a program analyst job:

Q:  Since you mentioned his name, what nationality is Gus Kebbie?
A [plaintiff]:  Gus is from Sierra Leone. . . .
Q:  Does he speak with an accent?
A:  Yes, he does.
Q:  He's a program analyst, right?
A:  Yes. . . .
Q:  And he was formerly a coordinator like you?
A:  Yes.
Q:  Do you know whether or not he feels that he is being held back because of his nationality or race?
A:  What do you mean he is being held back, held back from what?
Q:  From promotions or other opportunities in the City of Philadelphia?
A:  He probably experienced it in the past.
Q:  He probably did?
A:  Yes.
Q:  But you don't know that?
A:  He spoke to me along that line.  I'm not here to discuss Gus.
. . .
Q:  When Gus was promoted, what was his rank on the examination he took?
A:  I don't have any idea.
Q:  Do you know how many positions were open when he was not promoted?
A:  I have no idea.  But the only thing I remember, he told me was, when I was going through my plight, he was one of the people that I just – he was like, Frances, you know what, they did the same thing to me.  I wasn't

16.

> promoted the first time.  He had to fight or whatever he did before he got
> promoted and he told me that.
> Q:  Did he say it was because of his race or because of his national origin?
> A:  That's exactly what it was because he is from Africa.  He told me that.

Pl. Dep. at 36-37, 39.  This kind of allegation, if properly supported in the record, might

create a triable issue of fact regarding pretext.  I am unwilling, however, to consider this

hearsay testimony, without more, to be "evidence with sufficient probative force that a

factfinder could conclude by a preponderance of the evidence that [impermissible factors

were] a motivating or determinative factor in the employment decision."  *Simpson*, 142

F.3d at 644-45.  *See Paich v. Nike, Inc.*, Civ. No. 06-1442, 2008 WL 696915, at * 10 n.4

(W.D. Pa. March 12, 2008) (finding, in a gender discrimination suit, "that the

unsubstantiated, hearsay statements referred to by Plaintiff in his Answers do not meet"

the *Simpson* standard to survive summary judgment); *Prestilio v. Sears, Roebuck & Co.*,

Civ. No. 99-2180, 2000 WL 190257, at *4 (E.D. Pa. Feb. 2, 2000) (discounting

speculation of age discrimination from a hearsay statement that was not accompanied by

admissible evidence).

I conclude that plaintiff can not show that the defendants' non-discriminatory

reason for their decisions was pretextual.  Accordingly, all the defendants are entitled to

judgment as a matter of law on Udujih's claims under Title VII, § 1981, and the PHRA.

B.    Equal Protection Claim

Udujih further charges, pursuant to 42 U.S.C. § 1983, that the defendants denied

her equal protection as guaranteed by the Fourteenth Amendment.  Amend. Compl. ¶

42(a).  The defendants move for summary judgment, arguing that plaintiff can point to no evidence suggesting discriminatory intent.  The City of Philadelphia further argues that Udujih has not established municipal liability against it.

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination.  They must demonstrate that they received different treatment from that received by other individuals similarly situated."  *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990) (internal citations and quotations omitted).  The Third Circuit has offered the following guidance for how to determine, at the summary judgment stage, whether a plaintiff has sufficient evidence of purposeful discrimination:

> [T]he Supreme Court held in *Washington v. Davis*, 426 U.S. 229 (1976), that intent is a *prima facie* element of any Constitution-based civil rights claims of discrimination, and thus the Supreme Court distinguished the constitutional standard for discrimination from the standard promulgated under Title VII. *Id*. at 238-39. *Id.* at 238-39. . . . It is now well established that a *prima facie* showing of discriminatory intent may be proven indirectly, without a "smoking gun," on the "totality of the relevant facts," . . . *if* coupled with some other indicia of purposeful discrimination.

*Pennsylvania v. Flaherty*, 983 F.2d 1267, 1273 (3d Cir. 1993) (emphasis in original). Accordingly, I will examine the totality of the circumstances here to determine if there is (i) an indirect suggestion of discriminatory intent by the defendants; and (ii) some other indicator of purposeful discrimination.

The record does not show that Udujih was treated any differently in 2004 than the other candidates for the program analyst position or that any of the defendants strayed

from hiring policies established city-wide by the civil service regulations.  Even were I to include plaintiff's experience from 2001, where Udujih was ranked third in consideration for two openings but allegedly never received an interview, and from that decided that some intent could be inferred, there is no badge of purposeful discrimination in the record here to carry Udujih's equal protection claim beyond summary judgment.  The defendants are all entitled to judgment as a matter of law on this cause of action.[5]

C.    Libel and Slander Claims Against Defendant Sykes

Plaintiff alleges that Kathy Sykes defamed her by making statements that Udujih (i) lacked certain computer skills and (ii) was unimpressive during her interview for program analyst.  Amend. Compl. ¶¶ 36, 64-67.  Sykes responds, *inter alia*, that her statements were not defamatory in nature and that, as statements of opinion on job matters by a supervising employee, they are not actionable.  Def. Mem. at 24.

To prevail on a defamation action in Pennsylvania, a plaintiff must prove (1) the defamatory character of the communication; (2) its publication by the defendant and application to the plaintiff; (3) the understanding by the recipient of its defamatory meaning and intended application to the plaintiff.; (4) special harm resulting to the plaintiff from its publication; and (5) abuse of a conditionally privileged occasion.  42 PA. CONS. STAT. § 8343(a).  Whether a statement is capable of defamatory meaning is a question for the court to determine at summary judgment.  *Tucker v. Phila. Daily News*, 848 A.2d 113, 123-24 (Pa. 2004).  "To determine whether a statement is capable of a

---

[5]  Accordingly, it is not necessary to address the issue of municipal liability.

19.

defamatory meaning, we consider whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Id*. at 124 (internal quotation omitted).

I conclude that, as a matter of law, the statements at issue here are not capable of defamatory meaning.  Defendant Sykes's alleged statements regarding Udujih's computer skills and her supposedly lackluster performance at a job interview could not be seen, by a reasonable jury, as lowering community esteem for the plaintiff or deterring individuals from associating with her.  Sykes is entitled to summary judgment on this claim.

D.      Claim for Infliction of Emotional Distress

Finally, plaintiff complains that the conduct of the individual defendants caused her to "experience feelings of anguish, grief, fright humiliation, distress, and powerelessness."  Amend. Compl. ¶ 68.  Udujih does not make clear whether this constitutes a claim for negligent or intentional infliction of emotional distress.

"The liability of an employer under [the Pennsylvania Worker's Compensation Act] shall be exclusive and in place of any and all other liability to such employes [sic], his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law . . ."  77 PA. STAT. § 481(a).  "The exclusivity provision of [Pennsylvania's Worker's Compensation Act] bars claims for intentional and/or negligent infliction of emotional distress arising out of an employment relationship."  *Matczak v. Frankford Candy & Chocolate Co*., 136 F.3d 933, 940 (3d Cir. 1997).  The only exception to these long-settled rules applies when the plaintiff can

20.

establish that the alleged conduct was "personal in nature and not part of the proper employer-employee relationship." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997). There is no record evidence suggesting that any of the individual defendants' allegedly injurious actions were personal and outside the employer-employee sphere, so the individual defendants are entitled to summary judgment on this claim.

## III.

For the reasons stated above, I conclude that there are no triable factual disputes in this suit and all defendants are entitled to judgment as a matter of law. An appropriate order follows.